IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| SUSAN STAROPOLI *et al.*, | : | |
| *Plaintiffs* | : | CIVIL ACTION |
| v. | : | |
| | : | |
| METROPOLITAN LIFE | : | |
| INSURANCE CO. *et al.*, | : | No. 19-2850 |
| *Defendants* | : | |

## **MEMORANDUM**

PRATTER, J.                                                                                           JULY 13, 2021

Susan Staropoli sued JP Morgan Chase U.S. Benefits Executive ("the Benefits Executive"), alleging breach of fiduciary duties. Ms. Staropoli and the Benefits Executive filed dueling motions for summary judgment. For the reasons that follow, the Court grants the Benefits Executive's motion, and denies Ms. Staropoli's.

### BACKGROUND

Ms. Staropoli began working for JPMorgan Chase Bank, N.A. ("JPMorgan") in 2002. Two years later, Ms. Staropoli enrolled her then-husband, Charles Staropoli, for Dependent Supplemental Term Life Insurance. Under the terms of this plan, as summarized in multiple documents that were sent to Ms. Staropoli, only spouses were eligible for coverage. In the event of a divorce, Mr. Staropoli had the right to "port" or convert the plan within the next 92 days. If he did not do so, he would not be covered. The plan required participants to provide notice of a change in status (including a divorce) to the Benefits Executive.

Sometime in February 2013, Ms. Staropoli informed Human Resources at JPMorgan that her divorce from Mr. Staropoli was "nearly finalized." At this time, Human Resources changed her tax withholding status from "married" to "single." Later that year, JPMorgan either terminated the life insurance policy, or Ms. Staropoli allowed it to lapse. On March 11, 2013, Mr. and

1

Ms. Staropoli formally divorced. Ms. Staropoli faxed copies of the divorce papers to JPMorgan in March 2014.

According to JPMorgan's records, in October 2015, Ms. Staropoli increased the amount of Mr. Staropoli's coverage from $50,000 to $300,000.[1] When JPMorgan again sent her a link to a "Summary Plan Document" ("SPD") in November 2015, as they had done in the past, Ms. Staropoli either did not read it or did not realize that Mr. Staropoli was ineligible for coverage. The SPD also stated that plan participants were responsible for ensuring that their enrolled dependents were and continued to be eligible.

After Ms. Staropoli increased the amount of Mr. Staropoli's coverage, her pay stubs contained regular withdrawals for "SPOUSE SUPPL TERM LIFE." The Benefits Web Center also showed that she had a current policy for "Adult Supplemental Life Insurance," and listed Mr. Staropoli as one of Ms. Staropoli's "Covered Dependents," along with her children.

Mr. Staropoli died on July 4, 2018. Ms. Staropoli filed a claim for death benefits with the insurer, MetLife. MetLife denied her claim, noting that Mr. Staropoli was not an eligible dependent because they had been divorced. Ms. Staropoli then filed this suit on her own behalf and on behalf of her children against JPMorgan and MetLife.[2]

JPMorgan and MetLife filed motions to dismiss. The Court granted those motions for three reasons. First, the Court held that JPMorgan was an improper defendant because the "Benefits Executive" was listed in the plan documents as the party legally responsible for administering the plan, not JPMorgan. *Staropoli v. Metro. Life Ins. Co.*, 465 F. Supp. 3d 501, 510 (E.D. Pa. 2020). Second, the Court held that the insurer, MetLife, was not liable because the complaint failed to

---

[1] As discussed further below, JPMorgan treated this as "re-enrolling" Mr. Staropoli, while Ms. Staropoli argues that she was merely increasing the amount of his coverage.

[2] For simplicity, the Court uses "Ms. Staropoli" to jointly refer to her and her children.

2

allege facts supporting an inference that JPMorgan was acting as MetLife's agent, that MetLife ever knew that Mr. and Ms. Staropoli had been divorced prior to 2018, or that MetLife had a duty to investigate Ms. Staropoli's application for compliance with eligibility rules. *Id.* at 515-21. Third, the Court dismissed Ms. Staropoli's benefits claim because, according to the plan's unambiguous language, Mr. Staropoli was ineligible for coverage. *Id.* at 513.

Ms. Staropoli then filed a Second Amended Complaint. Ms. Staropoli did not seek to remedy any pleading deficiencies against JPMorgan or MetLife; she did not pursue any claims against them. Ms. Staropoli seeks to recover against the Benefits Executive for breach of fiduciary duties. She alleges that the Benefits Executive was responsible for administering the plan and that, as a result, the Benefits Executive owed her fiduciary duties to Ms. Staropoli and also had duties to her two children.

### LEGAL STANDARD

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). An issue is "genuine" if there is a sufficient evidentiary basis on which a reasonable jury could return a verdict for the non-moving party. *Kaucher v. Cty. of Bucks*, 455 F.3d 418, 423 (3d Cir. 2006) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A factual dispute is "material" if it might affect the outcome of the case under governing law. *Id.*

On a motion for summary judgment, the Court must view the evidence presented in the light most favorable to the non-moving party. *See Anderson*, 477 U.S. at 255. However, "[u]nsupported assertions, conclusory allegations, or mere suspicions are insufficient to overcome

3

a motion for summary judgment." *Betts v. New Castle Youth Dev. Ctr.*, 621 F.3d 249, 252 (3d Cir. 2010).

The movant is initially responsible for informing the Court of the basis for the motion for summary judgment, and identifying those portions of the record that demonstrate the absence of any genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Where the non-moving party bears the burden of proof on a particular issue, the moving party's initial burden can be met simply by "pointing out to the district court that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325. After the moving party has met the initial burden, the non-moving party must set forth specific facts showing that there is a genuinely disputed factual issue for trial by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials," or by "showing that the materials cited do not establish the absence or presence of a genuine dispute." Fed. R. Civ. P. 56(c). Summary judgment is appropriate if the non-moving party fails to rebut by making a factual showing "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

## DISCUSSION

The Benefits Executive poses four reasons why its motion for summary judgment should be granted.

**I.    Whether Ms. Staropoli's Claims are Barred by the Statute of Limitations**

The Benefits Executive argues that Ms. Staropoli's claims are barred by ERISA's statute of limitations.[3] ERISA requires that actions alleging a breach of fiduciary duties be filed before

---

[3]    The Benefits Executive takes issue with Ms. Staropoli's description of § 1113 as a statute of limitations, citing a recent Supreme Court case describing it instead as a "statute of repose." *See Intel Corp.*

4

one of two deadlines. The first is six years after the last action which is a part of the alleged breach, or, in the case of a breach by omission, the latest date on which the fiduciary could have cured the breach. 29 U.S.C. § 1113(1). The second is three years after the plaintiff gained actual knowledge of the breach. *Id.* § 1113(2). The Benefits Executive argues that Ms. Staropoli's breach-by-omission claims (what it refers to as claims about "enrollment procedures") are barred by § 1113.

One of Ms. Staropoli's allegations falls within the first period. *Id.* § 1113(1). Ms. Staropoli alleges that the Benefits Executive breached its fiduciary duties by failing to stop her from re-enrolling Mr. Staropoli in October 2015. Her complaint was filed on July 18, 2019—within the six-year period.

However, Ms. Staropoli's remaining claims, which are based on enrollment procedures, date back to early 2013, outside of the six-year period. The question is whether these claims fall within the second (the three year) period. *See id.* § 1113(2). In other words, did Ms. Staropoli file her lawsuit within three years after she gained actual knowledge of the breach? The Benefits Executive argues that she did not, because she had actual knowledge of the plan requirements at least by the time that she tried to re-enroll Mr. Staropoli in late 2015. Ms. Staropoli did not bring these claims until more than three years after she re-enrolled Mr. Staropoli.

However, receiving the plan documents does not establish that Ms. Staropoli had "actual knowledge" of the alleged breach. A plaintiff does not have "'actual knowledge' of the information contained in disclosures that he receives but does not read or cannot recall reading."

---

*Inv. Pol'y Comm. v. Sulyma*, 140 S. Ct. 768, 774 (2020) ("We have referred to § 1113(1) as a statute of repose . . . ."). The Benefits Executive is half right: § 1113(1) is a statute of repose because it is based on when the underlying events occurred, while § 1113(2) is a statute of limitations because it is based on when the plaintiff learned of the underlying events. *See id.* But many courts refer to § 1113 *as a whole* as a statute of limitations. *See, e.g., Williams v. Webb L. Firm, P.C.*, 628 F. App'x 836, 838 (3d Cir. 2015); *Bidlingmeyer v. Broadspire*, No. 11-cv-812 2011 WL 4470983, at *2 (E.D. Pa. Sept. 27, 2011). For immediate purposes, the difference is one of labels, and does not affect the Court's determination.

5

*Sulyma*, 140 S. Ct. at 773. Ms. Staropoli testified that she did not know about the alleged breach until after Mr. Staropoli died in 2018. While the Benefits Executive could well be correct that Ms. Staropoli should have known the contents of the plan document, that is not enough to trigger actual knowledge. Therefore, her claims are not barred by § 1113.

## II. Whether Ms. Staropoli Exhausted Administrative Remedies

The Benefits Executive next argues that Ms. Staropoli failed to exhaust her remedies. The Court previously rejected this argument which was advanced as a part of the motion to dismiss. *See Staropoli*, 465 F. Supp. 3d at 523. The Benefits Executive gives no reason why the Court should reconsider its earlier decision; therefore, the Court declines this argument for the same reasons set forth in the Court's prior opinion.

## III. Whether Ms. Staropoli's Children are Proper Plaintiffs

The Benefits Executive next argues that Mr. and Ms. Staropoli's children, Sam and Ava Staropoli, are not proper plaintiffs because, under the terms of the plan, only Ms. Staropoli could have been a designated beneficiary. The Benefits Executive concedes that Ms. Staropoli testified that she listed her children as beneficiaries, but argues that she must have been mistaken because the plan only allows employees to be beneficiaries.

The determination of proper plaintiffs is not susceptible to resolution on a motion for summary judgment. The alleged conflict between Ms. Staropoli's testimony and the Benefits Executive's documentary evidence can only be resolved by a jury. Moreover, the document that the Benefits Executive cites actually contradicts its position, saying: "[y]ou can name anyone as your beneficiary . . . or you can name more than one person to share the benefit." Doc. No. 50-4 at 16. Because this is a disputed factual matter, the Court rejects the Benefits Executive's argument that Sam and Ava Staropoli are not proper plaintiffs.

## IV. Whether the Benefits Executive Breached Fiduciary Duties

The Court now turns to the heart of the present controversy: whether either party is entitled to summary judgment on Ms. Staropoli's claims that the Benefits Executive breached its fiduciary duties. A fiduciary may breach its duties by "either a misrepresentation or an omission." *In re Unisys Corp. Retiree Med. Benefits ERISA Litig.*, 579 F.3d 220, 228 (3d Cir. 2009). To succeed, Ms. Staropoli must show that "(1) the defendant was 'acting in a fiduciary capacity'; (2) the defendant made 'affirmative misrepresentations or failed to adequately inform plan participants and beneficiaries'; (3) the misrepresentation or inadequate disclosure was material; and (4) the plaintiff detrimentally relied on the misrepresentation or inadequate disclosure." *Id.* (quoting *Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am., U.A.W. v. Skinner Engine Co.*, 188 F.3d 130, 148 (3d Cir. 1999)).

ERISA lists categories of information that employers must affirmatively disclose. Reading ERISA's provisions concerning fiduciary duties so broadly as to require additional disclosures could render Congress's choice to enumerate affirmative duties meaningless. *See DiFelice v. Fiduciary Couns., Inc.*, 398 F. Supp. 2d 453, 464-65 (E.D. Va. 2005). Accordingly, courts have only found a breach of a duty to disclose information not required by ERISA in two limited situations: (1) the employer had "actual knowledge" that an employee was confused, but failed "to provide the employee information which the employer knows the employee needs in order to protect himself from harm"; or (2) the employer fostered a misunderstanding and failed to disclose additional information required to correct that misunderstanding. *Daniels v. Thomas & Betts Corp.*, 263 F.3d 66, 76 (3d Cir. 2001). *See also In re Unisys Corp. Retiree Med. Benefit "ERISA" Litig.*, 242 F.3d 497, 508-09 (3d Cir. 2001) ("[T]here are situations in which a fiduciary can reasonably foresee unreasonable reliance and, accordingly, be held accountable."); *Bixler v. Cent. Pa. Teamsters Health & Welfare Fund*, 12 F.3d 1292, 1300 (3d Cir. 1993) (holding that there is

7

"an affirmative duty to inform when the trustee knows that silence might be harmful"). Because the analysis for breach by omission and breach by misrepresentation differs, the Court will consider each group of claims separately.

**A. Breach by Omission**

Ms. Staropoli argues that the Benefits Executive breached its fiduciary duties by omitting three categories of information. First, she faults the Benefits Executive for not providing her individual notice that Mr. Staropoli was ineligible for coverage when JPMorgan received her divorce paperwork in 2013. Second, and similarly, she faults the Benefits Executive for not providing her individual notice that Mr. Staropoli was eligible to "port" or convert his policy after JPMorgan received her divorce paperwork. Third, she faults the Benefits Executive for not preventing her from re-enrolling Mr. Staropoli in October 2015.

Ms. Staropoli concedes that her interpretation of the plan was mistaken—had she read the summary plan documents, she would have learned that spouses became ineligible for coverage after divorce.[4] However, even if a plaintiff's interpretation is unreasonable, the plaintiff may

---

[4] Ms. Staropoli's only response to this point is to argue that the summary plan documents were distributed in a legally deficient manner. But, as counsel for Ms. Staropoli conceded during oral argument, this argument is entirely missing from her amended complaint. Therefore, the Court cannot consider it. Even if the Court did so, it is without merit.

Ms. Staropoli relies on a regulation, 29 C.F.R. § 2520.104b-31, that only came into existence in July 2020. Even assuming that her interpretation of this regulation is correct, under the then-existing law, putting plan documents on a website and informing employees of how they can access them was an acceptable method of furnishing disclosures. *See* Final Rules Relating to Use of Electronic Communication and Recordkeeping Technologies by Employee Pension and Welfare Benefit Plans, 67 FR 17264-01 at 17268, 2002 WL 520995 (Apr. 9, 2002). Cases interpreting this guidance affirm that JPMorgan's method of distribution was proper. *See Cent. States, Se. & Sw. Areas Health & Welfare Fund v. Haynes*, 397 F. Supp. 3d 1149, 1160 (N.D. Ill. 2019), *aff'd*, 966 F.3d 655 (7th Cir. 2020) (noting that it was sufficient to provide plan document by "posting it online and providing the link").

The cases Ms. Staropoli cites are not to the contrary. In all of those cases, the employer posted the plan documents online but never told the employee how to access them. *See Nolin v. Sempra Energy*, No. CV0705958, 2009 WL 10673590, at *3 (C.D. Cal. Mar. 6, 2009) (noting that an employer's "mere placement of an updated SPD on [an employer's] intranet site" was insufficient (quoting *Gertjejansen v.*

8

nonetheless prevail by showing that the employer had "actual knowledge" that the employee was mistaken and chose not to correct that confusion. *See Daniels*, 263 F.3d at 76.

Before considering the question of whether the Benefits Executive had actual knowledge of confusion, it is worth pausing to consider Ms. Staropoli's argument that JPMorgan and the Benefits Executive should have taken affirmative steps to reduce the chance of employee confusion, and to ensure that plan participants were complying with the terms of the plan. For example, Ms. Staropoli argues that after JPMorgan processed her divorce paperwork, it should have either automatically shared the paperwork with the Benefits Executive or reminded Ms. Staropoli that the plan required her to do so. And during oral argument counsel for Ms. Staropoli argued that JPMorgan could have easily changed its online system to avoid this problem, perhaps by integrating the Human Resources' systems with the Benefits Executive's, such that changes to an employee's marriage status for tax purposes would automatically trigger notification of pending ineligibility for certain benefits. But Ms. Staropoli cites no case requiring an employer to structure its website, "benefits portal," or other system in a particular way to anticipate employees' confusion, even if doing so would have reduced the chance of it. To prevail on a breach-by-omission claim, an employee must show that the employer *had* actual knowledge of the employee's mistake—not merely that the employer *might* have gained such knowledge if it had adopted a different system. *See In re Unisys Corp. Retiree Med. Benefit "ERISA" Litig.*, 242 F.3d 497, 509 (3d Cir. 2001) (noting that a fiduciary has a duty to "communicate to the beneficiary material facts affecting the interest of the beneficiary which he *knows* the beneficiary does not

---

*Kemper Ins. Cos., Inc.*, 274 F. App'x 569, 571-72 (9th Cir. 2008))); *Nebesny-Fender v. Am. Airlines, Inc.*, 818 F. Supp. 2d 1319, 1333 (S.D. Fla. 2011) (same); *Erwood v. Life Ins. Co. of N. Am.*, No. 14-cv-1284, 2017 WL 1383922, at *9 (W.D. Pa. Apr. 13, 2017) (same). Here, Ms. Staropoli actually received emails notifying her where she could find the documents, and signed a certification stating that she knew it was her responsibility to read and understand the dependent eligibility requirements.

9

know and which the beneficiary needs to know for his protection" (emphasis added) (quoting *Bixler*, 12 F.3d at 1302)).

Here, Ms. Staropoli's breach-by-omission claims fail because she has not introduced any evidence showing that the Benefits Executive had actual knowledge of her confusion. The first two claims—both of which center on events in early 2013—fail because the timeline makes it impossible for the Benefits Executive to have had actual knowledge. Ms. Staropoli testified that she informed Human Resources at JPMorgan that her divorce was "nearly finalized" in February 2013. At this time, Human Resources changed her tax withholding status from "married" to "single." Mr. Staropoli and Ms. Staropoli finalized their divorce on March 11, 2013. The parties dispute what happened next. Ms. Staropoli argues that JPMorgan terminated her coverage in 2013, and did not tell her that they had done so, leading her to believe that the policy was still in effect. Sometime in 2014, she sent them the final divorce papers. She argues that in 2016, the amount of available coverage increased from $50,000 to $300,000, so at that time she "increased Mr. Staropoli's death benefits" to this maximum. She further argues that when she attempted to increase his benefits, JPMorgan treated her decision as "re-enrolling," and did not inform her that Mr. Staropoli was ineligible, even though it possessed her divorce papers.

The Benefits Executive has a different account. Relying on business records, the Benefits Executive argues that it never terminated her coverage in 2013. Instead, it argues that the records show that the policy continued through the end of 2013, and Ms. Staropoli did not elect coverage in 2014. In 2014, she sent JPMorgan the divorce papers. Then, in October 2015, Ms. Staropoli chose to re-enroll Mr. Staropoli at $300,000. The Benefits Executive also contends that Ms. Staropoli is incorrect that the maximum increased to $300,000 in 2016, and asserts that this higher coverage level had in fact been available since at least 2010. Therefore, the Benefits

Executive argues that Ms. Staropoli's recollection of the reason she re-enrolled Mr. Staropoli is faulty.

Ms. Staropoli's self-serving account is problematic, given that the documentary evidence supports the Benefits Executive's account. But it does not matter. Even if one credits Ms. Staropoli's memory over documentary evidence (which, construing the evidence in favor of Ms. Staropoli, the Court does), there is no evidence showing that the Benefits Executive had any reason to know that Ms. Staropoli was confused. Indeed, Ms. Staropoli's claim may be weaker if the Court accepts her version of events. On her account, as soon as she submitted divorce paperwork, JPMorgan terminated the policy.[5] If she is right, then neither JPMorgan nor the Benefits Executive had any reason to inform her that Mr. Staropoli was ineligible because they did something even better: they gave her the individualized protection she (incorrectly) argues that ERISA obligates them to give, by automatically terminating her policy when they learned of her divorce.

Ms. Staropoli also gives no evidence to show that JPMorgan or the Benefits Executive knew she was confused about Mr. Staropoli's right to "port" or convert the policy after divorce. There is no testimony from any employee to demonstrate this knowledge; nor does Ms. Staropoli point to any comments she made to Human Resources that would have alerted JPMorgan to her supposed confusion. In cases where a court has found a breach by omission, there has been at least some evidence that the employer had actual knowledge that the employee was confused. *See, e.g., Bixler v. Cent. Pa. Teamsters Health & Welfare Fund*, 12 F.3d 1292, 1302 (3d Cir. 1993) (finding for the plaintiff where the defendant knew that the plaintiff could have avoided substantial medical

---

[5] Because the Court finds that there was no breach of fiduciary duties, it is unnecessary to consider the Benefits Executive's further argument that, if Ms. Staropoli's account is accurate, JPMorgan—and not the Benefits Executive—would be liable. Nor is it necessary to consider Ms. Staropoli's curious argument that JPMorgan—the principal—became the agent of its agent, the Benefits Executive.

11

expenses by signing up for COBRA benefits, and that the plaintiff was unaware of this possibility); *In re Unisys Corp. Retiree Med. Ben. ERISA Litig.*, 57 F.3d 1255, 1266 (3d Cir. 1995) (noting that defendant "had knowledge that its employees [mistakenly] believed . . . [that] the benefits that they had at the time they retired would continue for life"). Because there is no evidence that JPMorgan or the Benefits Executive were on notice that Ms. Staropoli was confused about the terms of the plan, they were "under no obligation, as far as ERISA is concerned, to correct what turns out to have been a mistaken assumption." *Int'l Union, United Auto., Aerospace & Agr. Implement Workers of Am., U.A.W. v. Skinner Engine Co.*, 188 F.3d 130, 150 (3d Cir. 1999).

Ms. Staropoli's third breach-by-omission argument is somewhat stronger. She argues that the Benefits Executive should have known that she was operating under a misunderstanding in October 2015 when she attempted to either increase the benefits for Mr. Staropoli, or simply re-enroll him (at the higher amount). By this point, JPMorgan had the divorce decree, not merely a representation from Ms. Staropoli that she would be divorced "soon." It is conceivable that a JPMorgan employee could have observed Ms. Staropoli attempting to re-enroll Mr. Staropoli, realized that this was impermissible, and chose not to say anything. If that happened, under the principles discussed above, the Benefits Executive could conceivably be liable.[6]

But, while it is perhaps possible that this could have happened, there is no evidence in the record that it—or anything like it—did. There is no evidence that a single JPMorgan employee processed Ms. Staropoli's paperwork at each stage of the process; indeed, it is more likely that multiple employees did so in separate pieces. The office where Ms. Staropoli submitted her divorce decree appears to have been wholly distinct from the Benefits Executive's offices, and

---

[6] This conclusion would, as already discussed, require the Court to impute JPMorgan's actions to the Benefits Executive.

12

there is no evidence that the two shared employee records with each other.[7] Furthermore, these events were spread out over an almost two-year period of time. As a result, Ms. Staropoli was unable to point to any specific employee that possessed sufficient information to realize that she was confused—even if the Court draws all arguably reasonable inferences in her favor.

To infer that an unnamed, undescribed employee actually realized that Ms. Staropoli was confused about the terms of the plan in 2015, the Court would have to attribute two almost supernatural powers to this hypothetical employee. First, the Court would have to assume that

---

[7] Ms. Staropoli's briefs relied on the fact that she had notified JPMorgan in 2013 and 2014 of her divorce as evidence that Defendants knew she was mistaken regarding the terms of the plan. But her briefs never argued that JPMorgan's Human Resources Department shared these documents with the Benefits Executive, or that Ms. Staropoli separately informed the Benefits Executive of her divorce.

During oral argument, the Court asked whether there was any evidence that the Benefits Executive specifically, not merely JPMorgan, learned of the divorce. Counsel for Ms. Staropoli argued for the first time that Exhibit P demonstrated that the Benefits Executive knew of the divorce. Exhibit P purports to be an automatically generated document issued by the Benefits Executive showing that Ms. Staropoli listed herself as "divorced" on a document listing the beneficiaries of her 401(k) savings plan. *See* Doc. No. 52-14 at 2. The Court does not consider this argument because it was only raised for the first time during oral argument. *See In re Avandia Mktg., Sales Pracs. & Prod. Liab. Litig.*, 484 F. Supp. 3d 249, 261 & n.67 (E.D. Pa. 2020) (holding that an argument was "waived 'because it was raised for the first time at oral argument'" (quoting *Montrose Med. Grp. Participating Sav. Plan v. Bulger*, 243 F.3d 773, 783 (3d Cir. 2001)).

And even if this argument had been properly raised, it would not change the outcome. The Court considers Exhibit P without the benefit of any briefing from the parties, but several deficiencies are obvious. The document appears to have been automatically generated when Ms. Staropoli designated her beneficiaries for her 401(k) plan. *See* Doc. No. 52-14 at 3 ("This document was generated via the Online Beneficiary Designations application."). There is no evidence that any employee working for the Benefits Executive ever saw this document. It is as plausible that Ms. Staropoli was able to designate her beneficiaries in the aforementioned online " benefits portal" without any assistance or input from the Benefits Executive (or JPMorgan). And even if an employee of the Benefits Executive saw this document, there is no evidence regarding how many people (if any) worked in the Benefits Executive's office, which employees were responsible for managing the 401(k) plan and life insurance plan, or whether the person(s) responsible for the life insurance plan would have had access to the 401(k) plan's documents. And even if the Court assumes that a Benefits Executive employee read this document, and that this same employee also had access to Ms. Staropoli's life insurance plan documents, this document was generated on December 19, 2017—more than two years *after* Ms. Staropoli re-enrolled Mr. Staropoli, and more than four years *after* the Staropolis divorced. There is no evidence sufficient for the Court to draw the inference that this hypothetical employee would have remembered the terms of Ms. Staropoli's life insurance plan, compared it with Exhibit P, and realized that Ms. Staropoli was operating on a misunderstanding. In sum, Exhibit P is insufficient to meet the "actual knowledge" requirement.

13

every piece of information known by one JPMorgan employee was also known by every other employee. While JPMorgan's institutional knowledge may be impressive, it does not yet reach the level of a "hive mind."[8] (And, of course, no court has adopted such a standard of institutional knowledge.) Second, the Court would have to attribute incomparable memory to this employee. Ms. Staropoli first notified JPMorgan that she would soon divorce in February 2013, sent the divorce decree to JPMorgan in March 2014, and then re-enrolled Mr. Staropoli in October 2015. The Court cannot simply assume that an employee who learned of Ms. Staropoli's divorce would (1) recall that fact between one and a half to two and a half years later, (2) recall the terms of Ms. Staropoli's life insurance policy, and then (3) realize that Ms. Staropoli must be operating on a misunderstanding of the plan. While the Court must "make every *reasonable* inference in [the non-moving] party's favor," it will not make inferences that are unreasonable or fantastical. *Duvall v. Hustler*, 447 F. Supp. 3d 311, 315 (E.D. Pa. 2020) (emphasis added). Therefore, the Court will grant the Benefits Executive's motion as to the breach-by-omission claims.

### B. Breach by Misrepresentation

Next, Ms. Staropoli argues that the Benefits Executive misled her into believing that Mr. Staropoli was covered in two ways: first, by withdrawing premiums from her paycheck for "SPOUSE SUPP TERM LIFE" coverage; and second, by listing Mr. Staropoli as a covered dependent on the company's "Benefits Web Portal." She argues that these two "representations" misled her into believing that Mr. Staropoli was covered.

But neither of these statements—to the extent that they were "statements" at all—were misrepresentations, much less material ones. A misrepresentation is material if "there is a

---

[8] *See Star Trek: The Next Generation: The Best of Both Worlds* (June 18, 1990) (a popular science-fiction television episode in which the villain is the "Borg Collective," an alien species whose consciousnesses are linked into a single "hive mind," allowing information from each individual to be shared with every other member of the collective).

14

substantial likelihood that it would mislead a reasonable employee in making an adequately informed retirement decision." *In re Unisys Corp. Retiree Med. Benefits ERISA Litig.*, 579 F.3d at 228 (quoting *Harte v. Bethlehem Steel Corp.*, 214 F.3d 446, 452 (3d Cir. 2000)). All of the representations here were true. Nothing in the Benefits Web Center or in the confirmation of enrollment certified that Ms. Staropoli had complied with every requirement of the plan. This is particularly true of the automatic label placed on withdrawal of funds from her paycheck, which said nothing more than that the funds were being used for spousal life insurance. If this description led Ms. Staropoli to believe that Defendants were certifying her compliance, her belief was objectively unreasonable. If anything, the fact that the withdrawals included the word "spouse" should have been a signal that something was amiss—not a reassurance that everything was in order. By withdrawing funds for spouse supplemental life insurance, the Benefits Executive was not representing that Mr. Staropoli still qualified under the terms of the plan any more than it was representing that Mr. Staropoli was still Ms. Staropoli's spouse, something she certainly knew was untrue.

The Third Circuit Court of Appeals has already ruled against a plaintiff in a similar situation in *Reed v. Citigroup Inc.*, 658 F. App'x 112 (3d Cir. 2016). In that case, the plaintiff argued that a web portal showing that he was enrolled through October 31, 2031, caused him to believe that he would receive disability benefits through that date, whether or not he was still eligible under the terms of the plan. *Id.* at 117. But this was only the maximum time that he could be eligible. *See id.* The appellate court noted that "the plan documents . . . put [the plaintiff] on notice that he was required to provide information showing that he continued to be disabled under the Plan, and that the Maximum Benefit date was not the only possible time that his benefits could be terminated." *Id.* at 118. *See also Funicelli v. Sun Life Fin. (US) Servs. Co.*, No. 12-cv-6659,

2014 WL 197911, at *8 (D.N.J. Jan. 14, 2014) ("Plaintiff could not have reasonably relied upon Defendant's continued acceptance of premiums as evidence of continued coverage, when the explicit language of the Plan in Plaintiff['s] possession indicates that coverage had terminated and could only be revived upon application accompanied by proofs provided by Plaintiff.").

Here, too, Ms. Staropoli's belief was objectively unreasonable because the law charged her with knowledge of the contents of the summary plan document, as well as other supplementary documents, all of which stated in plain English that only spouses could be covered, and that divorce would terminate coverage. Indeed, Ms. Staropoli does not even argue that these documents were in any way equivocal—she only claims that she did not read them, even though she certified on multiple occasions that she had done so. The fact that JPMorgan withdrew funds from her paycheck does not change the calculation. To hold otherwise would undermine ERISA, because employers always withdraw funds for employees who sign up for ERISA-governed benefits. If a withdrawal of funds from an employee's paycheck is all that is required to sustain a breach of fiduciary duties claim, then every plaintiff would have such a claim, regardless of the care the employer took to educate its employees about the plan's requirements and regardless of the plaintiff's knowledge of her or his own basic circumstances.

In sum, even construing the facts in the light most favorable to Ms. Staropoli, she has not shown that the Benefits Executive breached its fiduciary duties, either through omission or misrepresentation.[9]

---

[9] Because the Court concludes that Ms. Staropoli has not shown a breach of fiduciary duties, it need not decide the Benefits Executive's argument that she has not shown damages.

16

## Conclusion

For the foregoing reasons, the Court will grant the Benefits Executive's motion for summary judgment, and deny Ms. Staropoli's motion for summary judgment. An appropriate order follows.

BY THE COURT:

*/s/ Gene E.K. Pratter*
GENE E.K. PRATTER
UNITED STATES DISTRICT JUDGE